IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| TODD WYNNE, on behalf of himself and all others similarly situated, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. 2:09-CV-00260-TJW |
| AMERICAN EXPRESS COMPANY, | § § § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion to Compel Arbitration and Dismiss Complaint or Alternatively to Stay Proceedings (Dkt. No. 14). Plaintiff is opposed to the motion. The Court has carefully considered the parties' submissions, the record, and the applicable law. For the following reasons, the Motion is GRANTED in part and DENIED in part.

I.  BACKGROUND

Plaintiff Todd Wynne ("Wynne") contends that Defendant American Express ("Amex") advertises and offers a "no pre-set spending limits" credit card account. It was based on this "no pre-set spending limits" representation that Wynne decided to obtain a credit card account with Amex. As part of the credit card agreement, Wynne was required to pay an annual fee. Wynne contends that it was only after becoming a customer that he became aware that, contrary to its representation, Amex routinely applies spending limits to its charge accounts and automatically declines transactions once those limits are reached. As a result, Wynne claims that he and the class paid annual fees for a product they never received and sustained further damages when card transactions were declined. It was based on this that Wynne sued Amex for deceptive trade

practices, negligent misrepresentation, and fraud relating to its "no pre-set spending limits" representation.

Amex contends that the credit card account and Wynne's claims are governed by an agreement titled "Agreement Between Preferred Rewards Gold Card Member and American Express Bank, FSB" ("Agreement"). Amex now elects to resolve Wynne's claims by arbitration pursuant to an arbitration provision in this agreement. Amex further contends that the Agreement prevents Wynne from seeking relief through a class action. Specifically, the relevant portions of the Agreement state:

Arbitration

**Definitions:** As used in this Arbitration Provision, the term "Claim" means any claim, dispute or controversy between you and us arising from or relating to your Account, this Agreement…and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above agreements… "Claim" includes claims of every kind and nature, including but not limited to, initial claims, counterclaims, cross-claims and third-party claims and claims based upon contract, tort, fraud, and other intentional torts, statutes, regulations, common law and equity…

**Initiation of Arbitration Proceeding/Selection of Administrator:** Any Claim shall be resolved, upon the election by you or us, by arbitration pursuant to this Arbitration Provision…

**Significance of Arbitration:** IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM, FURTHER, YOU AND WE WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION…

**Restrictions on Arbitration:** IF EITHER PARTY ELECTS TO RESOLVE A CLAIM BY ARBITRATION, THAT CLAIM SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS. THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION BASIS OR

ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC, OTHER CARDMEMBERS OR OTHER PERSONS SIMILARLY SITUATED…

**Arbitration Procedures:** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act…

Based on this arbitration provision, Amex moves the Court to enter an order compelling Wynne to arbitrate only his claims and stay this action pending arbitration, or alternatively, to dismiss this action. Wynne opposes Amex's motion contending that the Agreement and its arbitration provision are invalid and unenforceable.

## II. LEGAL STANDARDS

Under the Federal Arbitration Act ("FAA"), an arbitration agreement that involves interstate commerce is "valid, irrevocable, and enforceable, save upon such grounds as exist for the revocation of any contract." 9 U.S.C. § 2. To determine whether an arbitration agreement is enforceable, courts must apply the relevant state law principles that govern contract formation. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-44 (1995). "[A] party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). However, "[w]hile there is a strong federal policy favoring arbitration, the policy does not apply to the initial determination whether there is a valid agreement to arbitrate." *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004). "Nonetheless, once a court determines that an agreement to arbitrate exists, the court must pay careful attention to the strong federal policy favoring arbitration and must resolve all ambiguities in favor of arbitration." *Id.* That is, Section 3 of the FAA requires the Court to

stay court proceedings pending arbitration for any issue covered by an arbitration agreement. *Hornbeck Offshore Corp. v. Coastal Carriers Corp*, 981 F.2d 752, 754 (5th Cir. 1993) (holding that once it is determined that the dispute is subject to an arbitration agreement, then a stay of proceedings is mandatory pursuant to the FAA).

## III. ANALYSIS

As an initial matter, the Court notes that the parties do not dispute that the alleged arbitration agreement is governed by the FAA, nor that the alleged arbitration agreement affects interstate commerce as required by the FAA. Instead, the parties dispute whether the alleged arbitration agreement is valid under various federal regulations, state laws, and basic contract principles. As explained below, the Court concludes that the arbitration agreement is enforceable and is required to stay the matter pending arbitration.

### a. Enforceability of the Choice-of-law Provision in the Agreement

Amex contends that the Agreement's choice-of-law provision establishes that Utah Law should govern the current dispute. Wynne does not appear to directly dispute this other than to rely heavily on two Texas cases in his analysis, *Morrison v. Amway Corp.*, 517 F.3d 248, 255 (5th Cir. 2008) and *Harrison v. Blockbuster, Inc.*, 622 F. Supp. 2d 396 (N.D. Tex. 2009). Given this, the Court assumes that Wynne believes Texas Law should govern the current dispute. The Court is of the opinion, however, that the choice-of-law provision is enforceable and that Utah law should govern the agreement for the following reasons.

In evaluating whether a contractual choice-of-law clause is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state *Cantu v. Jackson Nat'l Life Ins. Co.*, 579 F.3d 434, 437 (5th Cir. 2009). In Texas, the parties

may agree that the law of a specified jurisdiction will govern their agreement. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990). Indeed, the Texas Uniform Commercial Code states that "when a transaction bears a *reasonable relation* to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." TEX. BUS. & COMM. CODE § 1.301(a) (emphasis added).

In applying the Texas Uniform Commercial Code, Texas courts generally look to the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 ("the Restatement") to determine whether a "reasonable relation" exists. *Cantu*, 579 F.3d at 437; *DeSantis*, 793 S.W.2d at 677 ("We believe the rule is best formulated in section 187 of the [restatement] and will therefore look to its provisions in our analysis of this case."). Section 187(2) of the Restatement is most relevant to this case and generally states that the law of the state chosen by the parties to govern their contractual rights and duties will be applied unless: (1) the chosen state has no substantial relationship to the parties or the transaction or (2) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which. RESTATEMENT § 187(2); *see, e.g., DeSantis*, 793 S.W.2d at 678.

Based on these factors, the Court concludes that Utah law should govern the Agreement. First, the Agreement expressly states that Amex is located in Utah, the cardholder agreement was entered into in Utah, and that the account is held in Utah. The Court is of the opinion that this establishes a substantial relationship between Utah, the parties, and the transaction. Second, as will be discussed in further detail, the Court concludes that the application of Utah law is not

contrary to a fundamental policy of Texas. Therefore, the choice-of-law provision in the Agreement is enforceable and the Court concludes that Utah law should govern the Agreement.

It should also be noted that the Restatement does not offer much guidance on what would be contrary to a fundamental policy of Texas. *DeSantis,* 793 S.W.2d at 680 ("The RESTATEMENT offers little guidance in making this determination. Comment g states only that a 'fundamental' policy is a 'substantial' one, and that '[t]he forum will apply its own legal principles in determining whether a given policy is a fundamental one within the meaning of the present rule. . . ."). Because it is not exactly clear what constitutes a fundamental policy of Texas, the Court will analyze the relevant arguments under both Utah and Texas law assuming that if the results are the same, then it would necessarily follow that it is not contrary to a fundamental policy of Texas. It is important to note, however, that "[c]omment g to section 187 does suggest that application of the law of another state is not contrary to the fundamental policy of the forum merely because it leads to a different result than would obtain under the forum's law." *Id.*

**b. Enforceability of the Arbitration Agreement Under the FAA and Utah Law**

"The FAA reflects the fundamental principle that arbitration is a matter of contract and places arbitration agreements on an equal footing with other contracts." *Rent-A-Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010). Thus, the FAA requires this Court to enforce the Agreement according to its terms. *Id.* Like other contracts, however, arbitration agreements may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

Wynne argues that the arbitration agreement is invalid because it is illusory. Specifically, Wynne contends that the change-in-terms provision is illusory because it provides Amex with a unilateral right to modify the agreement at any time in the future. The change-in-terms provision states that Amex "may change the terms of or add new terms to this Agreement at any time, in accordance with applicable law. We may apply any changed or new terms to any then-existing balances on your Account as well as future balances." Wynne also argues that this change-in-terms provision makes the entire Agreement illusory, and thus fails to provide the underlying consideration for the arbitration provision. Wynne further contends that the Agreement is unconscionable because it is so one-sided that it violates Texas public policy. For the reasons discussed below, the Court disagrees with Wynne's arguments and concludes that the arbitration provision is enforceable.

First, there are two types of validity challenges under section 2 of the FAA: "One type challenges specifically the validity of the agreement to arbitrate," and "[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 444 (2006). Only the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-404 (1967); *Buckeye*, 546 U.S. at 444-446; *Preston v. Ferrer*, 552 U.S. 346, 353-354 (2008).

In the present case, Utah law expressly allows change-of-terms provisions in credit cards. UTAH CODE ANN. § 70C-4-102. Thus, Wynne's contention that the unilateral change-in-

terms provision makes the arbitration provision invalid is clearly contrary to Utah law. Outside of relying on *Morrison* and *Blockbuster*, Wynne's only response to this argument is to discuss *Homa v. Am. Express Co.*, 558 F.3d 225, 233 (3d Cir. 2009), for the proposition that the New Jersey Supreme Court may find class-arbitration waivers violate New Jersey public policy. But, New Jersey public policy is not relevant to the current case because it does not accurately reflect Utah or Texas law. Indeed, Wynne concedes that class actions waivers are permissible under Utah and Texas Law. (Dkt. No. 25 at 14). Thus, Wynne has failed to rebut that the change-in-terms provision makes the arbitration agreement invalid under Utah law.

Additionally, Wynne's reliance on *Morrison* is misguided for at least two reasons. First, the court's analysis in *Morrison* was under Texas law, not Utah law. As discussed, Utah law expressly allows change-of-terms provisions in credit cards accounts. Second, the court in *Morrison* held that the unilateral arbitration agreement was illusory because it did not include a *Halliburton* type saving clause. *Morrison*, 517 F.3d at 257 ("There are no *Halliburton* type savings clauses which preclude application of such amendments to disputes which arose (or of which Amway had notice) before the amendment."). As referenced in *Morrison,* a *Halliburton* saving clause is one that prevents one party from including an entire arbitration program without notice or after the dispute has arisen. *Id.*

In contrast to *Morrison*, the change-of-terms provision in the present Agreement provides that Amex "may change the terms or add new terms to this Agreement at any time, *in accordance with applicable law*." (emphasis added). The applicable law in Utah states that "a creditor may change any written term of an open-end consumer credit contract at any time while the open-end consumer credit contract is in effect and apply the new term to the unpaid balance

8

in the account if: (i) the creditor mails or delivers written notice of the change …" UTAH CODE ANN. § 70C-4-102. Thus, the facts in *Morrison* are distinguishable from the present case because Amex was required, by statute, to provide notice if it wanted to modify the arbitration provision in the Agreement. Indeed, Utah law expressly provides that there are only a few situations where a written notice is not required. UTAH CODE ANN. § 70C-4-102(4); *see also* UTAH CODE ANN. § 70C-4-102(2)(b) ("A creditor may change an open-end consumer credit contract … [without notice] *to include* [not eliminate] arbitration or other alternative dispute resolution mechanism.") (emphasis added).

To be sure, this is not a situation where an arbitration agreement was added after the dispute had arisen, like in *Morrison*. Instead, the arbitration provision was included in the original Agreement and was never changed or altered. Wynne does not contend that the arbitration provision contained in the original contract is any different than the one that he asking the Court to conclude is unenforceable.

In addition, the arbitration provision explicitly states that once arbitration is chosen by any party, neither party will have the "RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM, FURTHER, YOU AND WE WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION…" In other words, the parties have mutually agreed to arbitration upon the election by either party. This agreement cannot be unilaterally altered once arbitration begins. Further, both parties have also mutually agreed to waive their right to participate in a class action.

Moreover, both Utah and Texas law have found that the underlying agreement can serve as the consideration for a party's promise to arbitrate. *Tanner v. Provo Reservoir Co.,* 76 Utah 335, 289 P. 151, 154 (Utah 1930) ("It has been repeatedly held that a person by acceptance of benefits may be estopped from questioning the existence, validity and effect of a contract."); *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005) ("But when an arbitration clause is part of an underlying contract, the rest of the parties' agreement provides the consideration.). Thus, Wynne's contention that the change-of-terms provision makes the entire agreement illusory is contrary to both Utah and Texas law because the underlying agreement can ensure that the promise is not illusory.

Apparently cognizant of this fact, Wynne then argues that the entire Agreement is illusory and cannot provide the necessary consideration. Interestingly, Wynne relies on the same change-in-terms provision as the basis for this contention. It is well settled, however, that this type of validity challenge is one that must be left for the arbitrator to decide because it unquestionably addresses the validity of the entire contract. *Rent-A-Center*, 130 S. Ct. at 2775 (holding that because the party challenged the validity of the Agreement *as a whole*, the issue was for the arbitrator); *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003) ("Only if the arbitration clause is attacked on an independent basis can the court decide the dispute; otherwise, general attacks on the agreement are for the arbitrator."); *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 190 (Tex. 2007)("As this defense relates to the parties' entire contract rather than the arbitration clause alone, it is a question for the arbitrators."); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001) ("We again note that these defenses must specifically relate to the Arbitration Addendum itself, not the contract as a whole, if they are to

defeat arbitration.).  Thus, the Court concludes that Wynne's contention that the entire Agreement is unenforceable is an issue for the arbitrator to determine.

### c. The Agreement is Not Unconscionable and Does Not Violate a Fundamental Policy of Texas.

As discussed above, Utah law expressly allows both change-of-terms provision and class-action waivers.  UTAH CODE ANN. § 70C-4-102, 105.  Thus, under Utah law, the Agreement is not unconscionable given the statutory approval.  Despite this conclusion, Wynne contends that the agreement is both procedurally and substantively unconscionable under "a number of state and federal courts around the country." (Dkt. No. 25 at 13).  Specifically, Wynne argues that the agreement is substantively unconscionable because: (1) it only binds the consumer to arbitration and (2) it is a contract of adhesion.  In addition, Wynne also argues that the arbitration provision is procedurally unconscionable because it is presented on a "take it or leave it" basis by a party with far superior bargaining power.

Under Utah law, a party claiming unconscionability bears a heavy burden. *Ryan v. Dan's Food Stores, Inc.,* 972 P.2d 395, 402 (Utah 1998).  To determine whether a contract is unconscionable, Utah law provides a two-pronged analysis whose ultimate goal is to identify and prevent oppression and unfair surprise.  *Id.*  The first prong—substantive unconscionability—focuses on "the contents of an agreement" to determine whether a contract's terms are "so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an overall imbalance in the obligations and rights imposed by the bargain . . . according to the mores and business practices of the time and place."  *Id.* (quoting *Resource Management Co. v. Weston Ranch*, 706 P.2d 1028, 1043 (Utah 1985)).  Similarly in Texas, the test for substantive

unconscionability is whether, "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *In re FirstMerit Bank*, 52 S.W.3d at 757. Wynne has not met his heavy burden to prove the agreement was so one-sided as to be unconscionable under either Utah or Texas law.

First, per the Agreement, both parties are bound to arbitrate once either of the parties elects arbitration. Thus, there is a mutual obligation to arbitrate and Wynne is not the only party bound to arbitration. Second, even though the arbitration provision may require a party to waive its rights to litigate in court, there is nothing inherently unconscionable about this waiver. Indeed, federal and state law strongly favors arbitration. *Docutel Olivetti Corp. v. Dick Brady Sys.*, 731 P.2d 475, 479 (Utah 1986) ("It is our policy to interpret arbitration clauses in a manner that favors arbitration."); *Cantella & Co. v. Goodwin*, 924 S.W.2d 943, 944 (Tex. 1996)("Federal and state law strongly favor arbitration."). In addition, the arbitration provision requires Amex to pay the opposing party's filing fees when they exceed the fees that a party would have incurred if they would have brought the action in state or federal court. Thus, from an economic perspective, the agreement is not one-sided because the party opposing arbitration will not incur any additional filing cost.

Finally, both Utah and Texas law follow the longstanding principle that parties are free to contract as they see fit, which includes the freedom to establish terms and allocate risks. *See, e.g., Ryan,* 972 P.2d at 402; *In re Bank of Am., N.A.*, 278 S.W.3d 342, 344 (Tex. 2009). In that vein, adhesion contracts with arbitration clauses are not automatically unconscionable. *Adams v. Merrill Lynch Pierce Fenner & Smith*, 888 F.2d 696, 700 (10th Cir. 1989) ("[E]ven if they were

contracts of adhesion, we find no authority that arbitration clauses are unconscionable."); *In re AdvancePCS*, 172 S.W.3d at 608 ("Adhesion contracts are not automatically unconscionable, and there is nothing per se unconscionable about arbitration agreements."). In light of these longstanding principles, Wynne's conclusory and unsupported statements completely fail to establish that the arbitration provision is so one-sided that it is substantively unconscionable under the circumstances. *Ryan*, 972 P.2d at 402. ("Even if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable.").

Regarding procedural unconscionability—the second prong in the Utah analysis—Wynne contends that the arbitration provision is unconscionable because it is presented on a "take it or leave it" basis by a party with far superior bargaining power. First, "[u]nder the FAA, unequal bargaining power does not establish grounds for defeating an agreement to arbitrate absent a well-supported claim that the clause resulted from the sort of fraud or overwhelming economic power that would provide grounds for revocation of any contract." *In re AdvancePCS,* 172 S.W.3d at 608 (Tex. 2005) (citing *Gilmer*, 500 U.S. at 33). Moreover, unconscionablity principles should only be applied to prevent unfair surprise or oppression, not to negate a bargain simply because one party to the agreement may have been in a less advantageous bargaining position. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 679 (Tex. 2006).

To support his contention, Wynne focuses on the number of pages in the agreement, size of the font, and location of the arbitration provision as evidence of procedural unconscionability. (Dkt. No. 25 at 13). It is not clear how these facts relate to a "take it or leave it" offer by someone with superior bargaining power. Instead, they simply appear to provide a factual summary of what is obvious from the face of the Agreement. For this reason, Wynne fails to

13

offer any tenable proof that there was unfair surprise or oppression in the Agreement as a whole. For example, Wynne has not asserted that there was fraud, deceit, or misrepresentation involved in the acceptance of the agreement. Accordingly, Wynne is bound by the Agreement. *In re McKinney,* 167 S.W.3d 833, 835 (Tex. 2005) (holding that absent fraud, misrepresentation, or deceit, parties are bound by the terms of the contract, regardless of whether they read it). In addition, because the Court concludes that the arbitration provision is not substantively unconscionable, Wynne's factual summary fails to rise to the level that would render the agreement unconscionable. *Ryan,* 972 P.2d at 402. ("We have acknowledged that substantive unconscionability alone may support a finding of unconscionability but that procedural unconscionability without any substantive imbalance will rarely render a contract unconscionable.")

As discussed above, Wynne also contends that the Agreement is unconscionable because it contains a one-sided class action and class arbitration prohibition that violates Texas public policy. Again this conclusory statement is not supported by any facts, law, or authority. Indeed, Wynne even concedes that both Texas and Utah courts have found that class action waivers are permissible. (Dkt. No. 25 at 14). Wynne also submits a *Homa* issue preclusion argument that has no merit. (Dkt. No. 25 at 17). As discussed above, the court in *Homa* was concerned with violation of New Jersey public policy and not Texas public policy. For these reasons, the Court concludes that the arbitration provision is neither unconscionable under Utah law nor violates a fundamental policy of Texas.

Finally, Wynne's Complaint includes claims under the Deceptive Trade and Practice Act. It is well settled that the FAA establishes a policy "favoring arbitration, requiring that courts

rigorously enforce arbitration agreements." *Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987). Moreover, the duty of a court to give effect to an arbitration clause "is not diminished when a party bound by an agreement raises a claim founded on statutory rights." *Id.* Thus, the mere fact that Wynne asserts a claim based on the Deceptive Trade and Practice Act does not diminish the applicability of the FAA.

### d. The Claims are Within the Scope of the Arbitration Provision

Having determined that the Agreement and arbitration provision is enforceable, the second step of the inquiry is to determine if the dispute in question falls within the scope of the arbitration provision. The Texas Supreme Court has emphasized that under the FAA, "any doubts as to whether [a plaintiff's] claims fall within the scope of the agreement must be resolved in favor of arbitration." *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995). In the present case, the Agreement states:

> *The term "Claim" is to be given the broadest possible meaning* that will be enforced and includes, by way of example and without limitation, *any claim, dispute or controversy that arises from or relates to* (a) any of the accounts created under any of the Agreements, or any balances on any such accounts.

(emphasis added). Furthermore,

> This Arbitration Provision shall survive termination of your accounts as well as voluntary payment of the Account balance in full by you, any legal proceeding by you or us to collect a debt owed by the other, any bankruptcy by you or us, and any sale by us of your Account.

The Agreement's language requiring arbitration of any controversy or claim that "arises from or relates to" any of the accounts is recognized as broad language favoring arbitration. *See Prima Paint,* 388 U.S. 395. Additionally, the Agreement itself appears to expressly address Wynne's dispute about the "no pre-set spending limit" representation by stating that "[t]he Card has no

pre-set spending limit. Each Charge is evaluated in light of your spending and payment patterns on your Account …" Thus, there is no question that Wynne's claims are within the scope of the arbitration provision because the Agreement expressly lays out the terms related to this "no pre-set spending limit" representation.

Furthermore, Wynne does not appear to dispute that the claims are within the scope of the arbitration agreement, but instead only challenges the validity and enforceability of the Agreement and its arbitration provision. Because the Court concludes that there is a valid and enforceable agreement to arbitrate, it has no choice but to compel arbitration. *Prudential,* 909 S.W.2d at 899 (Tex. 1995) (holding that once the party seeking arbitration establishes that an agreement exits under the FAA and that the claims raised are within the agreement's scope, the trial court has no discretion but to compel arbitration).

## IV. Conclusion

For the foregoing reasons, the Court is of the opinion that Amex's Motion to Compel Arbitration and To Stay the Proceedings (Dkt. No. 14) should be GRANTED, and that Amex's Alternative Motion to Dismiss the Complaint should be DENIED. Accordingly, the Court ORDERS that this case should be STAYED and ADMINISTRATIVELY CLOSED pending completion of arbitration on an individual basis. It is further ORDERED that the parties are to report to the Court every sixty days on the status of the arbitration proceeding.

IT IS SO ORDERED.

SIGNED this 30th day of September, 2010.

*T. John Ward*
_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE